## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| STEEL SPORTS INC., a Delaware corporation, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | C.A. No. 1:12-cv-00418-GMS DEMAND FOR JURY TRIAL |
| JOHN CONNER AND DEBORAH CONNER, | ) ) ) | |
| Defendants. | ) ) | |
| and | ) ) | |
| JOHN CONNER AND DEBORAH CONNER, | ) ) ) | |
| Counterclaim Plaintiffs, | ) ) | |
| v. | ) ) ) | |
| STEEL SPORTS, INC., a Delaware Corporation, STEEL PARTNERS HOLDINGS, L.P., a Delaware Limited Partnership, STEEL EXCEL, INC., a Delaware Corporation, THE SHOW, LLC, a Delaware Limited Liability Company, WARREN G. LICHTENSTEIN, an individual, JOSH SCHECHTER, an individual. | ) ) ) ) ) ) ) ) ) ) ) | |
| Counterclaim Defendants. | ) | |

## ANSWER AND COUNTERCLAIM

## ANSWER

Defendants John Conner ("Conner") and Deborah Conner (collectively referred to as "the

Conners" or the "Conner Defendants"), by and through their undersigned attorneys, hereby file

their Answer to the Complaint filed against them by Steel Sports Inc. ("Steel Sports") in the

above-referenced action.   The Conner Defendants deny each and every allegation contained in the Complaint unless expressly admitted herein.

1.      The Conner Defendants deny the allegations contained in paragraph 1 of the Complaint.

2.      The Conner Defendants are without sufficient knowledge to admit or deny the remaining allegations contained in paragraph 2 of the Complaint.

3.      The Conner Defendants admit the allegations contained in paragraph 3 of the Complaint.

4.      The Conner Defendants admit the allegations contained in paragraph 4 of the Complaint.

5.      The Conner Defendants deny the allegations contained in paragraph 5 of the Complaint.

6.      The Conner Defendants admit the allegations contained in paragraph 6 of the Complaint.

7.      The Conner Defendants admit that they consent to personal jurisdiction and venue in Delaware for the resolution of this dispute, but deny the remaining allegations contained in paragraph 7 of the Complaint.

8.      The Conner Defendants admit that their business operated under the name "the Show", admit that the Conner Defendants sponsored, hosted, operated and managed youth baseball and softball tournaments and other events and outfitted fully licensed Major League Baseball, minor league, college replica and custom designed uniforms, but deny the remaining allegations contained in paragraph 8 of the Complaint.

9.      The Conner Defendants deny the allegations contained in paragraph 9 of the Complaint as they refer to Deborah Conner, but admit the allegations related to Conner.

10.     The Conner Defendants deny the allegations set forth in paragraph 10 of the Complaint.

11.     The Conner Defendants admit that their revenue came from two main sources of income, but deny the remaining allegations contained in paragraph 11 of the Complaint.

12.     The Conner Defendants deny the allegations contained in paragraph 12 of the Complaint as it refers to Deborah Conner, admit that Conner provided forms of "Tournament Host Agreements" and other agreements, some were signed and some were not, but is without sufficient knowledge to admit or deny the remaining allegations contained in paragraph 12 of the Complaint and therefore deny the same.

13.     The Conner Defendants deny all allegations against Deborah Conner contained in paragraph 13 of the Complaint.  The Conner Defendants admit that Conner represented to Steel Partners Holding, LP ("Steel Partners"), that a large percentage of the revenues came from the sale of uniforms; admit that the business was one of the largest "hot split" on-field dealers of apparel licensed by Majestic Athletics.  Admit that Majestic is a well known sports apparel manufacturer and licensor and the current uniform provider for major league baseball, but deny the remaining allegations contained in paragraph 13 of the Complaint.

14.     The Conner Defendants deny all allegations against Deborah Conner contained in paragraph 14 of the Complaint.  The Conner Defendants admit that Conner represented to Steel Partners, that there was a dispute with the Optimist Club, and admit that some books and records for 2009 and 2010 were in the custody and control of the Optimist Club, and were therefore unavailable, but deny the remaining allegations contained in paragraph 14 of the Complaint.

15.     The Conner Defendants deny all allegations against Deborah Conner set forth in paragraph 15 of the Complaint.   The Conner Defendants admit that after they were induced by Steel Partners representatives to stop using their lawyer and to rely on representatives of Steel Partners, that they signed signature pages for a number of purported agreements they never saw and for which they received a $1.5 million dollars and other promises that were never performed, and that they contributed all of the assets of the business to The Show LLC, which they have since been locked out of, but deny the remaining allegations contained in paragraph 15 of the Complaint.

16.     The Conner Defendants deny the allegations contained in paragraph 16 of the Complaint.

17.     The Conner Defendants deny the allegations contained in paragraph 17 of the Complaint.

18.     The Conner Defendants deny the allegations contained in paragraph 18 of the Complaint.

19.     The Conner Defendants admit that the language set forth is contained in Section 5.22 of the Asset Contribution Agreement, but deny the remaining allegations contained in paragraph 19 of the Complaint.

20.     The Conner Defendants deny the allegations contained in paragraph 20 of the Complaint.

21.     The Conner Defendants admit that the revenue and profits in 2009 and 2010 were less than "millions of dollars", but deny the remaining allegations contained in paragraph 21 of the Complaint.

22.     The Conner Defendants deny the allegations contained in paragraph 22 of the Complaint.

23.     The Conner Defendants deny the allegations contained in paragraph 23 of the Complaint.

24.     The Conner Defendants admit that "Tournament Host Contract" forms, which are non-binding letters of intent, were sent to Schechter, some of which were signed by tournament directors and some of which were not, and that Schechter directed Conner to sign the remaining documents; when Conner balked at this, Schechter stated it was necessary and insisted that Conner comply, and he did.  The Conner Defendants deny the remaining allegations contained in paragraph 24 of the Complaint.

25.     The Conner Defendants admit that they were one of Majestic's largest "hot split" on-field dealers, but deny the remaining allegations contained in paragraph 25 of the Complaint.

26.     The Conner Defendants deny that all allegations against Deborah Conner contained in paragraph 26 of the Complaint.  The Conner Defendants admit that there was a dispute with the Optimist Club, that certain books and records were unavailable, admit that Conner was at one time the President of the Optimist Club, but deny the remaining allegations contained in paragraph 26 of the Complaint.

27.      The Conner Defendants deny the allegations contained in paragraph 27 of the Complaint.

## FIRST CAUSE OF ACTION
### (Fraud)

28.     The Conner Defendants incorporate by reference their responses to paragraphs 1 through 27 above, as if fully set forth herein, as their response to paragraph 28 of the Complaint.

29.     The Conner Defendants deny the allegations contained in paragraph 29 of the Complaint.

30.     The Conner Defendants deny the allegations contained in paragraph 30 of the Complaint.

31.     The Conner Defendants deny the allegations contained in paragraph 31 of the Complaint.

32.     The Conner Defendants deny the allegations contained in paragraph 32 of the Complaint.

33.     The Conner Defendants deny the allegations contained in paragraph 33 of the Complaint.

## SECOND CAUSE OF ACTION
### (Breach of Contract)

34.     The Conner Defendants incorporate by reference their responses to paragraphs 1 through 33 above, as if fully set forth herein, as their response to paragraph 34 of the Complaint.

35.     The Conner Defendants deny the allegations contained in paragraph 35 of the Complaint.

36.     The Conner Defendants deny the allegations contained in paragraph 36 of the Complaint.

37.     The Conner Defendants deny the allegations contained in paragraph 37 of the Complaint.

38.     The Conner Defendants deny the allegations contained in paragraph 38 of the Complaint.

39.     The Conner Defendants deny that Steel Sports is entitled to any of the relief set forth, in its prayer for relief in the Complaint.

## AFFIRMATIVE DEFENSES

### FIRST DEFENSE

Plaintiffs' claims are barred by the doctrine of unclean hands.

### SECOND DEFENSE

Plaintiffs' claims are barred by their own acts of deceit, misrepresentation and fraud and the acts of its agents, parent companies, affiliates and their officers, employees and agents.

### THIRD DEFENSE

Plaintiff has waived any claims against the Conner Defendants as a result of the actions of its self and agents in preparing the various documents they now complain.

### FOURTH DEFENSE

Plaintiff is barred by the doctrine of estoppels.

### FIFTH DEFENSE

Plaintiffs' claims are barred as the result of failure of consideration.

### SIXTH DEFENSE

Plaintiff fails to state a claim upon which relief can be granted.

### SEVENTH DEFENSE

The allegations in the Complaint are about documentation that was never seen by the Conner Defendants and was largely prepared by Steel Partners.  The Conner Defendants always dealt with representatives of Steel Partners, although there were references to Steel Excel, Inc., Steel Sports Inc., Newco Sports Inc., and others.  All of these entities were instruments, alter egos, or agents of Steel Partners.

## EIGHTH DEFENSE

The Conner Defendants were summarily terminated by the LLC.  While Conner was out of town on business, the doors to the offices, which previously had been John Conner's offices prior to the transaction, had their locks changed.  All files, computers and information regarding this transaction and the business of the LLC, as well as personal information of the Conners, were removed by the Plaintiff or the Plaintiff's agents.  The Conner Defendants have few or no records to set forth a detailed defense at this time.  The Conner Defendants reserve the right to amend this Answer and assert additional defenses, counterclaims and third-party claims during the course of discovery, once they have access to their records and files.

WHEREFORE having fully answered John Conner and Deborah Conner pray that the Court enter judgment in their favor and against Steel Sports, Inc., that they be awarded their costs incurred in defending this action, including reasonable attorneys fees, and for such further relief as the Court deems appropriate.

## COUNTERCLAIM

Defendants John Conner ("Conner") and Deborah Conner (collectively referred to herein as the "Conners" or the "Conner Defendants") hereby assert their Counterclaims against Steel Sports, Inc. ("Steel Sports"), Steel Partners Holdings, LP ("Steel Partners"), Steel Excel, Inc. ("Steel Excel"), The Show, LLC (the "LLC"), Warren G. Lichtenstein ("Lichtenstein"), and Josh Schechter ("Schechter") (collectively referred to herein as "the Steel Affiliates"),  and in support thereof state as follows:

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332.

2. Venue is proper under 28 U.S.C. § 1391.

3.      Counterclaim Plaintiffs John and Deborah Conner are individuals residing in Oklahoma City, Oklahoma.

4.      Steel Sports, Inc. is a corporation formed under the laws of the state of Delaware, and, upon information and belief, maintains its principal place of business in Milpitas, California.

5.      Steel Partners Holdings, L.P., is a limited partnership formed under the laws of the state of Delaware, and, upon information and belief, maintains its principal place of business in New York, New York.

6.      Steel Excel, Inc. is a corporation formed under the laws of the state of Delaware, and, upon information and belief, maintains its principal place of business in San Ramon, California.

7.      The Show, LLC, is a limited liability company formed under the laws of the state of Delaware, and, upon information and belief, maintains its principal place of business in Oklahoma City, Oklahoma.

8.      Upon information and belief, Lichtenstein is the Chairman and Chief Executive Officer of Steel Partners Holdings, LP, the Chairman of Steel Excel, Inc., a principle of The Show, LLC and resides in California.

9.      Upon information and belief, Schechter is a Managing Director of Steel Partners Holdings, LP, a Director of The Show, LLC, and resides in California.

10.     Since 1998 the Conner Defendants, in particularly John Conner, operated a facility called Del City Ball Park (the "Ball Park") located in Del City, Oklahoma, a suburb of Oklahoma City, Oklahoma.

11.     The Ball Park consisted of a group of baseball fields and concession stands, and, through the Ball Park, the Conner Defendants operated leagues, tournaments and uniform sales. Since its inception, the Ball Park became "the park to play at" for various youth and adult baseball teams and leagues in the Oklahoma City area.

12.     For several years, the Conner Defendants realized that uniforms became a more profitable element of the business.   John Conner came to promote more tournaments and outfitted youth ball players in officially licensed Major League Baseball (MLB) team uniforms to use in these tournaments, as well as in league play.   This concept could be and was expanded from the Ball Park to other locations.

13.     The Conners began this new concept in 2008, which proved to be a huge success. Consequently, the Conners sold the Ball Park and went into the business of promoting tournaments and selling uniforms in various parts of the country.   These tournaments and league events proved to be very successful particularly in Oklahoma, Southern California, and subsequently other areas.

14.     The business was a small family partnership owned by John and Deborah Conner and was operated under the name "the Show".

15.     In the fall of 2010, Conner received a phone call from Schechter, who introduced himself as being associated with a large hedge fund, Steel Partners.   In fact, Schechter is a Managing Director of Steel Partners.   He stated that Steel Partners had 400 million dollars in cash and a huge tax loss to offset income and was interested in investing in the sports business. He stated that the chairman of Steel Partners, Lichtenstein, had a 10-year-old son involved in baseball and that Lichtenstein had recognized the large market that existed for youth, and their parents, who were interested in sports.   Lichtenstein developed a personal interest in exploiting

this market and wanted Steel Partners to invest in the sports industry.   Lichtenstein was interested in the Show.   Conner was skeptical and stated he had no interest in selling his company.

16.     Telephone calls continued to occur between Conner, Schechter, and Michael Bland ("Bland"), another Steel Partners director.   In February 2011, Lichtenstein and other Steel Partners representatives met with Conner at an event Conner was putting on in Redondo Beach, California.   After an impressive pitch, Conner remained uninterested.

17.     This led to an effort by both Lichtenstein and Schechter, which was spearheaded by Schechter, to dazzle the Conner Defendants with wining and dining, and included sports celebrities and other high flyers in California.   Over a period of months it became difficult for the couple not to be swept away with the glamour and attention.   Over the next several months, in addition to Lichtenstein and Schechter, the Conner Defendants were introduced to Dennis Mannion ("Mannion"), the former President of the Los Angeles Dodgers, former Vice President of Marketing and Sales for the Philadelphia Phillies organization, and current President of the Detroit Pistons, and also participated on conference calls with Steel representatives including Bobby Valentine, a long time manager in professional baseball who is presently managing the Boston Red Sox.   Both gentlemen were involved with Steel Partners.   The Conner Defendants were impressed.

18.     Eventually it worked.   The Conners were very impressed with Mannion and what he could bring to the table.   The Conner Defendants agreed to begin discussions on what might be worked out.   Schechter, Bland and an unknown San Francisco accounting firm descended on Del City, Oklahoma to review records and create documentation for "the Board".   These

activities were primarily managed by Schechter, but Lichtenstein would call and ask why the deal was not done yet.

19.     The Show was a relatively small unsophisticated family business. Conner became concerned that Schechter kept saying that "we have to pump up the numbers for the Board." Conner kept saying "these are *projections* for the future. I can't say what we will do in the future." Conner became concerned that the projections he had previously developed for future growth were being manipulated by Schechter and his team, who had removed him from the process, to create something that wasn't true. He expressed his concerns to Lichtenstein who told him "just listen to Josh (Schechter) and give him what he needs, we will take care of the rest. You have more than you think you have, you just don't know it." Conner provided what records he had. John was not a sophisticated financial person and continued to be concerned. However, he decided he had to trust Schechter, and he reluctantly resigned himself to leaving the financials in the hands of Schechter and his team.

20.     As the deal developed, it appeared that Steel Partners would pay the Conner Defendants $4.5 million, in addition to earn out rights equal to $6.75 million, and an employment agreement for the right to purchase 75% of the assets to a company to be formed called Newco Sports, Inc., that later appeared to be called Steel Sports, Inc., the Plaintiff. Steel Sports would then contribute the assets into an LLC set up by Steel Partners called "The Show, LLC". John Conner would contribute the remaining 25% of the assets to the LLC, and this would be the operating entity. Throughout this transaction Steel Sports, Steel Partners and Steel Excel, and their employees and agents (collectively referred to herein as "the Steel Affiliates") acted interchangeably with the Conner Defendants. All of the entities seemed to be controlled by

Lichtenstein and "the Board."  Schechter, Lichtenstein, Bland and others seem to speak for all of those companies.

21.     Schechter represented to Conner that the deal was to close originally in April 2011.  The Conners were to receive approximately $4.5 million up front and the earn out of $6.75 million, along with other terms.  Schechter told Conner that the Board had problems with the backup for revenue based on the projections prepared under Schechter's direction, but assured Conner that Lichtenstein wanted this to happen and he would handle the Board. However, the closing date kept creeping back one week, then two weeks, and then months at a time.  These delays became a problem because the season was beginning for tournaments. Schechter and his team wanted the deal closed before the tournaments could be conducted and the delays and interference by the Steel Affiliates was hurting the business greatly.  Conner had made promises he could not now keep.  Conner had to cancel tournaments because the Steel Affiliates wanted to close the deal before the tournaments took place.  This caused a great deal of financial loss and loss of credibility for Conner.  It finally looked like the deal would close on August 5th.  However, after the Conners signed documents and sent them to the Steel Affiliates, another delay occurred on Plaintiff's side of the table.

22.     On Friday August 12, 2011, Conner sent an email to Lichtenstein which stated:

> Warren, tried to call you.
>
> Here is where we are at.  I cannot offer to sell you something that I continue to lose ground on each day.  This afternoon, I lost an additional tournament director and a league he is associated with due to our situation.  Right now each day things change and not for the better.  This will not change until we secure funding Monday and make people whole who have been waiting far too long.  This is not your problem, I know, but it is mine.
>
> The issue is I simply have no way of assuring you or anyone else what we will or will not have going forward.  I cannot know the

true turnout of events, or numbers of events our-outsourced directors will still hold or cancel. There is no way today that I can give you accurate assumptions of the future until I fix the problems. I know some directors will never come back, but there are many directors we can use including in-house rather than out-sourcing.

I have two options that are workable for me and the situation we are in:

1.     We will receive the loan we have in place now (or from you, as offered) on Monday to help stop the bleeding and work to get the business back on track. I believe we can do that over the next several months and at the same time create the paper trail needed for your guys to revalue us then. At that time, hopefully we both wish to get a deal done and we do it then.

2.     We can rebuild it under the Steel umbrella. Debbie and I have a choice, we build it ourselves and hope you are still open to buying once we do or sell you a slimmed down version of what we have now and rebuild it with you. I would propose that we sell you the shell of the business (75/25) for $1.5 million now, reducing Steel's risk to almost nothing and whatever we are able to salvage and maintain above that is a bonus. Additionally, our employment agreement would be as written with the change John $150,000 annually and Debbie $50,000 annually. We would propose that in September 2012 you re-evauluate the success we have had in rebuilding and issue a cash bonus to us. I will not suggest what formula should be used. I trust that by then we will have proven ourselves as valuable to Steel and will be treated fairly.

Let me close by saying that I truly want to be in business with you, and wish that things had not happened as they have, but they did. Trying to make lemonade out of lemons here. I know we are more than capable to rebuild any losses once we get back on our feet and are willing to provide it by either rebuilding it on our own and then bringing it to you or doing it under your umbrella now.

I sincerely hope we can find a way to make things work, but understand if we cannot.

These are the only two options we are comfortable moving forward with and leave it up to you to decide if you wish to pursue either with us.

Thanks

John

23.     On August 13, 2011, Lichtenstein sent an email to Conner stating "I am up.  This seems great.  Let's discuss this today and get it done."  This was followed up with a couple of scenarios being discussed which involved Lichtenstein offering financing personally, or using Steel Partners, and their newly created entity Steel Sports.  Lichtenstein decided that the better scenario was for Steel Partners to go forward using Steel Sports.  Lichtenstein and Schechter assured Conner that they would put together the documentation necessary to get the deal done and the closing would take place on August 15th.  John stated that he could no longer afford these delays and lawyers, he had had enough.  Schechter stated that "if you want to get this deal done we have to get the attorneys out of this, we will make the changes and let's get this deal done."

24.     Specifically, on or about August 13, 2012, Schechter and Conner discussed some final specifics over the telephone.  Conner wanted to verify that the sale of the shell of the Show for $1.5 million was not based upon any projections or future models that had been previously used or discussed, but only the company, as is, with no representations of future profitability.  In Conner's mind, this lack of representation on his part was the reason he and Deborah were willing to accept $1.5 million up front as opposed to $4.5 million.  Schechter represented to Conner that they were on the same page in this regard.  Additionally, Schechter represented to Conner that the **only** aspect of the employment agreements which were being revised was the amount of salary to be paid to the Conner Defendants.  Conner's employment agreement at that time stated that he would maintain control of the day-to-day operations of the Show, LLC and that he possessed spending authority of $100,000.00, both of which were essential terms in Conner's mind.

25.     On or about August 15th, without seeing any new documents or consulting counsel based upon the insistence of Schechter, the Conner Defendants relied on the representation of Schechter and Lichtenstein, acting on their own or as agent for Plaintiff, and signed signature pages for employment agreements, an LLC agreement, an asset contribution agreement, and perhaps others and sent them back to counsel for the Steel Affiliates. Subsequently the $1.5 million was wired to their bank account.

26.     John and Deborah Conner did not see any of the agreements which they had signed until sometime later at which point they simply glanced to look at portions most relevant to them.   The Conner Defendants never received any of the schedules prepared by the Steel Affiliates.

27.     Upon closing, the assets belonging to the Show were transferred to the Show, LLC (the "LLC"), which was owned 75% by Plaintiff and 25% by John Conner.  The LLC was controlled by its board of directors comprised of two representatives of Steel Sports and a representative of John Conner.  The Steel Sports representatives on the board of the LLC were Schechter and Mannion, the Conner representative was Conner.   Mannions inclusion gave Conner comfort in the deal.  Shortly after closing, Mannion was removed and Lichtenstein took his place.  While John Conner had an employment contract naming him Vice President/General Manager of the Company, and Deborah Conner had an employment contract naming her Assistant General Manager, the business was principally run by representatives of Steel Sports who, through a series of actions and inactions, mismanaged the company, resulting in lost revenues, unhappy customers and eventually ran the business into the ground. John Conner's warnings, complaints and objections were wholly ignored throughout this process.  During this period of time, in addition to being given no control of how the business was run, Conner was

also informed that he was required to obtain approval to make any purchases for the business amounting to more than $10,000.00.

28.     On October 18, 2011, Steel Partners reported to its Annual Meeting of Limited Partners that its entity, Steel Excel (formerly a ADPT Corporation), had "recently set up a subsidiary (Steel Sports) that is in the process of building a business in the youth sports market (a very large, profitable, and fragmented market)". On information and belief, The Show, LLC was used to entice other companies to sell to the Steel entity.

29.     In April of 2012, Conner was on a business trip to outfit several leagues with player and coach uniforms.   He was informed by a representative of the Steel Affiliates that he was being terminated, Deborah Conner was being suspended with pay, the office locks were being changed, and that he was not to return to the office.  All files, computers and information regarding this transaction and the business of the LLC and personal information of the Conners' was removed by the Plaintiff or the Plaintiff's agents, and is believed to be in the possession of Plaintiff.

30.     Subsequently, the Conners have been informed that Plaintiff has shut down The Show, LLC, and it is no longer operating.

31.     This lawsuit was subsequently filed by Plaintiff and the Conner Defendants have only recently seen the schedules, which were attached to the Asset Contribution Agreement and were prepared by Schechter and Bland, or those acting with them.

32.     Throughout this transaction the Conner Defendants have dealt with the Steel Affiliates all of whom acted interchangeably and as one.

33.     The Conner Defendants have virtually no records to set forth a detailed defense or information to fully answer or assert counterclaims arising from this transaction at this time due

to their records having been confiscated by representatives of the Steel Affiliates.  The Conner Defendants reserve the right to amend its Answer, and assert additional defenses, counterclaims and third-party claims during the course of discovery, once they have access to their records, files and other relevant information.

### FIRST CLAIM FOR RELIEF
**(Fraud)**

34.    The Conner Defendants incorporate by reference the allegations contained in paragraph 1 through 33 above, as if fully set forth herein.

35.    The Steel Affiliates, through their agents, Schechter, Lichtenstein and Bland, and as set forth above, prepared false and fraudulent schedules which were attached to the Asset Contribution Agreement at issue in this case, without the knowledge of the Conner Defendants, along with signed signature pages containing the signature of the Conner Defendants, in an effort to shift blame from itself to the Conner Defendants.

36.    The Steel Affiliates, through their agents, Schechter, Lichtenstein and Bland, made representations to the Conner Defendants that these schedules would be done properly, upon which the Conner Defendants relied.

37.    As a result of this reliance, the Conner Defendants have been damaged in their own right, and in fact sued by the very entity that created this falsehood and benefited by it.

38.    As a result of this scheme, the Conner Defendants are entitled to an award of damages in an amount to be determined at trial of not less than $3 million.

39.    Based upon this foregoing conduct, the Conner Defendants are entitled to an award of punitive damages of not less than $10 million.

## SECOND CLAIM FOR RELIEF
### (Fraud in the Inducement)

40.    The Conner Defendants incorporate by reference the allegations contained in Paragraphs through 39 above as if fully set forth herein.

41.    On multiple occasions set forth above, Schechter and Lichtenstein, as agents of the Steel Affiliates, represented to the Conner Defendants that it was in their best interest to take certain actions, and encouraged and advised them to do so, including without limitation, to eliminate their attorney from discussions and to sign signature pages without being provided with copies of the actual agreements those pages.

42.    Additionally, on or about August 13, 2011, Schechter, acting as an agent of the Steel Affiliates and Lichtenstein, represented to Conner that the Asset Purchase Agreement for which Conner received only the signature pages did not incorporate any schedules, projections or models of future business, but was only a simple purchase of the shell of the Show, as is, without any representations from Conner as to future profitability, for $1.5 million up front in addition to other consideration.

43.    On or about August 13, 2011, Schechter, acting as an agent of the Steel Affiliates, also represented to Conner that the only difference between the employment agreement for which Conner only received the signature pages and the previous employment agreement the parties had agreed upon was the amount of salary to be paid to John and Deborah Conner, and that Conner would still maintain control of the day-to-day operations of The Show, LLC and would have spending authority up to $100,000.00.

44.    All of these foregoing representations to the Conner Defendants from Schechter, Lichtenstein and the Steel Affiliates were material, false, and were made by Schechter,

Lichtenstein and Steel Affiliates when they knew or should have known that the representations were false and that it was not in the Conner Defendants' best interest to take these actions.

45.     The Conner Defendants relied on these representations made by the Steel Affiliates, and did so reasonably, given the fiduciary nature of their relationship.  Were it not for the Steel Affiliates' encouragement, insistence, and misrepresentations, the Conner Defendants would not have ever entered into agreements with the Steel Affiliates.

46.     As a result of its reasonable reliance, the Conner Defendants have suffered harm to their detriment.  The actions of the Steel Affiliates constitute fraud in the inducement.

47.     As a result of this fraud in the inducement, the Conner Defendants are entitled to actual damages in an amount to be proven at trial of not less than $3 million.

48.     Based upon this foregoing conduct, the Conner Defendants are entitled to an award of punitive damages of not less than $10 million.

## THIRD CLAIM FOR RELIEF
### (Breach of Contract)

49.     The Conner Defendants incorporate by reference the allegations contained in paragraphs 1 through 48 above as if fully set forth herein.

50.     John and Deborah Conner both entered into employment agreements with The Show, LLC.

51.     Both employment agreements required at least thirty (30) says notice for termination without cause.

52.     In April of 2012, John Conner was terminated by a representative of The Show, LLC without any prior notice, and without having engaged in any activity meeting the definition of "Cause" in his employment agreement.

53.     Also in April 2012, Deborah Conner was suspended with pay without any prior notice and without engaging in any activity meeting the definition of "Cause" in his employment agreement, and subsequently The Show, LLC ceased paying her salary.

54.     These actions by The Show, LLC constitute a breach of both employment contracts.

55.     As a result of these breaches of contracts, the Conner Defendants are entitled to actual damages in an amount to be proven at trial of not less than $75,000.00.

**FOURTH CLAIM FOR RELIEF**
**(Breach of Contract of Good Faith and Fair Dealing)**

56.     The Conner Defendants incorporate by reference the allegations contained in paragraphs 1 through 55 above as if fully set forth herein.

57.     There is an implied covenant of good faith and fair dealing in every contract, and this covenant requires a party to a contractual relationship to refrain from arbitrary or unreasonable conduct which prevents the other party from receiving the fruits of the bargain.

58.     Steel Sports, acting by, through and with the Steel Affiliates have breached this covenant by a series of acts that have destroyed the business created by the Conner Defendants, destroyed the business contemplated under the agreement, and totally deprived the Conner Defendants of the fruits of the bargain entered into.

59.     Steel Sports, acting by, through and with the Steel Affiliates, has frustrated the overarching purpose of the contracts by taking advantage of its position to control implementation of the agreement terms.

60.     As a result, the Conner Defendants have been damaged in an amount to be proven at trial of not less than $3 million.

61.     As a result of the foregoing conduct, the Conner Defendants are entitled to punitive damages of not less than $10 million.

## FIFTH CLAIM FOR RELIEF
### (Breach of Fiduciary Duty)

62.     The Conner Defendants incorporate by reference the allegations contained in paragraphs 1 through 61 above, as if fully set forth herein.

63.     Steel Sports, as the controlling member of The Show, LLC, owes a fiduciary duty to John Conner.

64.     Steel Sports, acting through its members on the Board, has terminated John Conner as an Executive Vice President and General Manager, and Deborah Conner as Assistant General Manager as a result of their concerns relating to Steel Sports' representatives' mismanagement of the business which has damaged the reputation of The Show, LLC, caused tournaments to be canceled, and allowed league events to take place illegally with improper permits and licenses.  Ultimately, this has resulted in the demise of The Show, LLC as a business entity.

65.     Demand on the remaining board members would be futile.

66.     This breach of duty by Plaintiff has resulted in damage to the Show, LLC and John Conner in an amount to be proved at trial of not less than $3 million.

67.     As a result of the foregoing conduct, John Conner is entitled to punitive damages from Plaintiff in an amount to be proven at trial of not less than $10 million.

## SIXTH CLAIM FOR RELIEF
### (Accounting)

68.     The Conner Defendants incorporate by reference the allegations contained in paragraphs 1 through 67 above as if fully set forth herein.

69.     John Conner owns 25% of The Show, LLC and Steel Sports owns 75% of The Show, LLC.

70.     Through the actions set forth above, Steel Sports has denied Conner access to books and records of The Show, LLC. Steel Sports has converted all assets and funds of The Show, LLC to its own use, and denied Conner access or an accounting to the same.

71.     Conner is entitled to a full accounting of all assets, liabilities, and revenues attributed to The Show, LLC, from Steel Sports.

## SEVENTH CLAIM FOR RELIEF
### (Conversion)

72.     The Conner Defendants incorporate by reference the allegations set forth above in paragraphs 1 through 71 as if fully set forth herein.

73.     The Steel Affiliates have intentionally and wrongfully exercised dominion over 1) property belonging to The Show, LLC and 2) certain personal property owned by the Conner Defendants, in defiance and to the exclusion of John Conner and Deborah Conner's ownership rights in the same.

74.     As a result of this conversion, Conner is entitled to damages in an amount to be proven at trial of not less than $3 million.

75.     The Steel Affiliates' conversion was intentional and malicious and as a result Conner is entitled to damages in an amount of not less than $10 million.

## EIGHTH CLAIM FOR RELIEF
### (Unjust Enrichment)

76.     The Conner Defendants incorporate by reference the allegations set forth above in paragraphs 1 through 75 as if fully set forth herein.

77.     The Steel Affiliates have been enriched by their collective actions.

78.     Defendants have been impoverished by the actions of Plaintiff and the Steel Affiliates.

79.     Plaintiff's enrichment and Defendants' impoverishment are directly related and no justification exists for either.

80.     Under the fundamental tenets of fairness, justice and good conscience, it would be inequitable for the Steel Affiliates' enrichment to be allowed to stand due to Defendants' lack of a legal remedy.

81.     The Conner Defendants are entitled to accounting and a recoupment of funds and assets which have unjustifiably enriched the Steel Affiliates in an amount to be proven at trial.

## NINTH CLAIM FOR RELIEF
### (Declaratory Action Piercing the Corporate Veil)

82.     The Conner Defendants incorporate by reference the allegations contained in paragraphs 1 through 81 above as if fully set forth herein.

83.     The Steel Affiliates have acted as one and interchangeably in this fraud perpetuated upon the Conner Defendants, both as interchangeable alter egos and or mere instrumentalities of each other.

84.     Steel Sports was the alter ego of Steel Partners and Steel Excel, and was used by those entities for the purpose of committing a fraud against Defendants.

85.     Steel Sports was under the sole and exclusive control of "the Board" of both Steel Partners and Steel Excel, Inc.

86.     The Conner Defendants pray that this Court declare that the corporate or entity veil be pierced and declare that the actions and inactions of each of the Steel Affiliates be attributable to the other.

## TENTH CLAIM FOR RELIEF
### (Civil Conspiracy)

87.    The Conner Defendants incorporate by reference the allegations contained in paragraphs 1 through 86 above as if fully set forth herein.

88.    The Steel Affiliates and their officers, directors and employees have acted together as a civil conspiracy with the underlying wrongful purpose being to defraud and damage the Conner Defendants.

89.    The Conner Defendants request that this Court declare this a civil conspiracy and that the members of each are liable for the acts of the other in the commission of this wrong and that the Conner Defendants be awarded damages from the Steel Affiliates, Lichtenstein, Schechter and Bland, in an am0ount to be proven at trial of not less than $3 million, and punitive damages in an amount of not less than $10 million.

WHEREFORE having fully answered and having set forth its defenses and counterclaims, John Conner and Deborah Conner pray that this Court deny all relief set forth in the Complaint filed by Steel Sports Inc., and grant the Conners judgment declaring that the corporate veil be pierced as to Steel Sports, Inc. and the Steel Affiliates, or in the alternative, find that a civil conspiracy existed between these parties, grant the Conners an accounting of the The Show, LLC, and render a judgment to be proven at trial for actual damages at no less than $3 million and punitive damages in an amount of no less than $10 million, for all costs including

reasonable attorneys fees, and for such further relief as this Court deems appropriate.

ASHBY & GEDDES

*/s/ Richard L. Renck (#3893)*
Ricardo Palacio ( (#3765)
Richard L. Renck (#3893)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
RPalacio@ashby-geddes.com
RRenck@ashby-geddes.com

*Attorneys for Defendants John
Conner and Deborah Conner*

*Of Counsel:*

Tony W. Haynie
Chris M. Warzecha
CONNER & WINTERS, LLP
4000 One Williams Center
Tulsa, OK 74172-0148
(918) 586-8954
thaynie@cwlaw.com
cwarzecha@cwlaw.com

Dated: June 8, 2012